Slip Op. 15-38

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ZHEJIANG SANHUA CO., LTD, | |
|                Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Court No. 14-00007 |
|                Defendant. | |

**OPINION**

[Motion for judgment on the agency record denied; final results of administrative review sustained.]

Dated: April 24, 2015

    David A. Riggle and David J. Craven, Riggle and Craven of Chicago, Illinois for Plaintiff Zhejiang Sanhua Co., Ltd.

    L. Misha Preheim, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. With him on the brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Devin S. Sikes, Attorney, U.S. Department of Commerce for Trade Enforcement and Compliance of Washington, DC.

    **Gordon, Judge:** This action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering frontseating service valves from the People's Republic of China. See Frontseating Service Valves from the People's Republic of China, 78 Fed. Reg. 73,825 (Dep't of Commerce Dec. 9, 2013) (final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review on Frontseating Service Valves from the People's Republic of China, A-570-933

(Dep't of Commerce Nov. 29, 2013) ("Decision Memorandum"), available at http://enforcement.trade.gov/frn/summary/prc/2013-29333-1.pdf (last visited this date). Before the court is Plaintiff Zhejiang Sanhua Co., Ltd.'s ("Sanhua") motion for judgment on the agency record. See Pl.'s Rule 56.2 Mem. in Supp. of Mot. for J. on the Agency R. (July 31, 2014), ECF No. 24 ("Pl.'s Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

Sanhua challenges Commerce's use of facts available to calculate Sanhua's brass and copper byproduct offsets, Commerce's rejection of Sanhua's ministerial error submission, and Commerce's 15-day liquidation policy. For the reasons set forth below, the court sustains the Final Results on each issue.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2014).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Facts Available

Commerce calculates dumping margins by determining "the amount by which the normal value exceeds the export price or constructed export price of the subject

merchandise." 19 U.S.C. § 1677(35)(A). The statute permits certain downward adjustments to normal value, but does not address adjustments for byproduct sales. See id. § 1677b(a)(6)-(7). Commerce as a matter of policy, however, offsets normal value for the sale of byproducts generated during production of the subject merchandise during the period of review. See, e.g., Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review and New Shipper Review of Wooden Bedroom Furniture from the People's Republic of China, A-570-890, at 70-71 (Dep't of Commerce Aug. 11, 2008), available at http://enforcement.trade.gov/frn/summary/prc/E8-19303-1.pdf (last visited this date) (describing and applying scrap offset policy).

Sanhua sold brass and copper scrap during the period of review. Sanhua, though, did not track the quantity of scrap generated on a product-specific basis. Instead, in response to Commerce's request for product-specific figures, Sanhua reported brass and copper byproduct using a formula that extrapolated product-specific data from total scrap sales. As Commerce explained:

> Sanhua first calculated the sum of [the weight of] all reported [factors of production] for each [frontseating service valve, or FSV] which includes [factors of production] related to components not manufactured from brass or copper (e.g., nylon charge port caps). Sanhua then subtracted the total standard weight of each finished FSV from the sum of the [factors of production] for that FSV to determine each FSV's "difference." Next, Sanhua [multiplied] each FSV's "difference" by its [period of review] production quantity and summed the [results of that calculation for] all FSVs produced to determine the total "difference." Sanhua then divided the total weight of brass and copper scrap generated and sold during the [period of review] by the extended "difference" to determine the ratio of scrap [in grams] to difference [in grams]. Sanhua applied the brass and copper ratios to each FSV's "difference" to determine the FSV's brass and copper scrap offset.

Decision Memorandum at 21 (footnotes omitted). In other words, Sanhua calculated the difference in weight between the inputs before production of each valve and the standard final weight of each valve to estimate the weight of material lost during production. Sanhua then applied a ratio derived from the total weight of scrap it actually sold to approximate the portion of scrap metal in the total material lost during production. Sanhua's methodology resulted in estimated weights of brass and copper scrap on a product-specific basis. See id.

Commerce identified several potential problems with Sanhua's methodology. Decision Memorandum at 21-22. For example, Commerce observed that Sanhua's method depended in part on the weight of components "that bear[] no relationship to the scrap offset being claimed," and that Sanhua's method derives copper offsets in part from the amount of brass used in the production of some products. Id. Commerce noted that Sanhua in some instances claimed an offset even though it reported a total input weight lower than the final product weight. Most importantly, Commerce also observed that Sanhua's methodology did not account for "yield loss," the percentage of inputs neither incorporated into the final product nor recovered and sold as scrap. Commerce's concerns were confirmed at verification, finding "for most of the products examined" that Sanhua's method "resulted in higher scrap offsets than the yields reflected in the technical drawings of the components made of brass or copper inputs." Decision Memorandum at 22 (emphasis added).

Commerce turned to "facts available" to address the problems it identified with Sanhua's reported brass and copper offsets. The statute requires Commerce to use facts

otherwise available when, among other things, an interested party provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2)(D). Under this scenario, "Commerce may use as 'facts available' any 'information or inferences which are reasonable to use under the circumstances' to make the applicable determination or substitute for the missing information." Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1252 (Fed. Cir. 2009) (quoting Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1 at 869 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198).

Using other information available on the record, Commerce applied an adjustment to Sanhua's reported offsets to account for yield loss:

> To calculate the scrap adjustment for the final results, we summed the over- and under-reported brass and copper scrap offset quantities for all products examined at verification and divided this amount by the total reported brass and copper scrap offset for the same products to determine the overall over- or under-reported brass and copper scrap offset percentage of adjustment. We then applied this percentage adjustment to the CONNUM-specific brass and copper scrap offset quantities to determine the CONNUM-specific scrap adjustment. . . . [W]e find, as facts available, that this adjustment reasonably limits the brass and copper offset to the yield losses attributable to only those components produced using brass and copper inputs. We find that this approach is not adverse to Sanhua because it acknowledges that scrap is generated in the production of FSV and permits an offset and it includes both over- and underreported scrap amounts. We also find this adjustment to be reasonable because it is calculated based on the weighted-average over- and under-reported quantities of each product examined and represents both subject and non-subject merchandise.

Decision Memorandum at 23-24 (footnote omitted). Commerce noted, however, that "this adjustment does not resolve all of the Department's concerns with Sanhua's scrap allocation methodology." Id. at 23.

Sanhua requested that Commerce alter this methodology to account for scrap derived from damaged and purchased components. Commerce declined, explaining that "the brass and copper consumed in the production of the damaged components or products or the quantity of purchased components is not included in Sanhua's reported brass, copper, or purchased components [factors of production]," meaning that "the scrap generated from the damaged components or products was not generated from the production of the subject merchandise." Id. at 22-23. Commerce further explained that Sanhua's claimed offsets should actually be revised downward to exclude this scrap. However, Commerce was unable to make this downward adjustment because "the documentation regarding the number of pieces and related weights of damaged components is not available on the record" and that "documentation collected at verification reflects the number of pieces of damaged products, but not the corresponding product weights." Id. at 23 n.136.

Sanhua argues that Commerce's scrap offset calculation unreasonably failed to "take into account all the factors that generate scrap, caused distortions[,] and was not supported by company records." Pl.'s Br. at 4. Specifically, Sanhua contends that Commerce unreasonably relied on the full standard input and output weight described in certain technical drawings when calculating the yield loss adjustment. According to Sanhua, the "standard" product weights described in the drawings are theoretical maximum weights. Id. at 4-5. Sanhua insists that actual weight "normally is less [than standard product weight] due to experience and greater efficiency in manufacturing during the product lifetime," a fact confirmed by Commerce's own findings of lower product

weights at verification. Id. at 5. Sanhua points to record data showing that Commerce's use of standard product weights in its adjustment formula results in lower scrap offsets. Id. at 4-5. Sanhua also argues that Commerce's methodology unreasonably fails to account for scrap derived from inputs that Sanhua purchased. Sanhua in particular objects to Commerce's refusal to include purchased "damaged connection tubes" in its adjustment to copper offsets because these tubes constitute "the most significant source of copper scrap." Id. at 7.

Sanhua does not offer a specific alternative to Commerce's adjustment methodology. Instead, Sanhua argues that Commerce should have accepted Sanhua's unadjusted offset requests because Sanhua's methodology "ties to the company's own internal records" instead of some "theoretical calculation." Id.

Defendant responds generally that Commerce reasonably used facts available to adjust Sanhua's offset reporting. Defendant explains that Commerce requested scrap offset data on a product-specific basis, but that Sanhua did not maintain that information in the normal course of business. Def.'s Resp. to Pl.'s Mot. for J. upon the Admin. R. 12 (Sept. 30, 2014), ECF No. 25 ("Def.'s Resp."). According to Defendant, Sanhua's claim that its offset reporting "is based on its normal books and records" is misleading because Sanhua's methodology derives offset values indirectly. Id. at 13-14.

**Analysis**

Sanhua essentially argues that Commerce introduced inaccuracies into Sanhua's offset reporting that did not exist before. See Pl.'s Br. at 4-7. Sanhua had to calculate product-specific offsets indirectly because Sanhua did not record its brass and copper

byproduct on a product-specific basis. In fairness, Sanhua's methodology does tie to the amount of total scrap it produced, a data point Sanhua maintained in the normal course of business. Decision Memorandum at 21. As Commerce explained, however, Sanhua's scrap reporting methodology implied certain relationships between inputs, scrap production, and the subject merchandise that Commerce could not verify. In particular, Sanhua's formula derived offsets in part from inputs unrelated to scrap, potentially overstated the amount of copper scrap produced for certain models, and did not reflect differences in production yields between models. Decision Memorandum at 21-22. Commerce at verification observed that Sanhua's formula in fact produced "higher scrap offsets than the yields reflected in the technical drawings of the components made of brass or copper inputs" for "most" of the products evaluated by Commerce. Id. at 22. Sanhua does not present a cogent rebuttal to these findings.

Commerce must use facts available when a party provides information that Commerce cannot verify. 19 U.S.C. § 1677e(a)(2)(D); Decision Memorandum at 21-22. Sanhua does not challenge Commerce's application of facts available or identify any verifiable alternative adjustment methodology. In the court's view, Commerce analyzed the available record information and reasonably adjusted Sanhua's offset reporting methodology. The court therefore sustains this aspect of the Final Results.

### B. Ministerial Error Submission

Sanhua submitted a ministerial error request soon after Commerce issued the Final Results. Sanhua attached an exhibit to that submission containing information related to the surrogate value for brass scrap. Commerce rejected Sanhua's submission

because three pages of the exhibit contained "new" information. Specifically, Commerce observed that "Page 1 of exhibit ME-2 includes the Department's surrogate value . . . worksheet for [a prior administrative] review," and that "Pages 3 and 4 of exhibit ME-2 include import statistics for brass scrap from the Philippines National Statistics Office" not part of the original administrative record. Rejection of New Factual Information Contained in Zhejiang Sanhua Co., Ltd.'s December 9, 2013, Ministerial Error Letter, 1 (Dep't of Commerce Dec. 16, 2013), PD 130 ("Rejection Memorandum"). Commerce provided Sanhua with an opportunity to resubmit its request without the three offending pages. Id. at 1-2. Sanhua did so, but Commerce ultimately denied the entirety of Sanhua's request for ministerial error corrections. Ministerial Error Allegation Memorandum, 1-4 (Dep't of Commerce Jan. 9, 2014), PD 136 ("Error Memorandum"). Sanhua now challenges Commerce's decision to reject the three pages attached to its initial ministerial error submission because, in Sanhua's view, those three pages did not contain "new" information. Pl.'s Br. at 9-12.

    The court does not agree. Sanhua insists the rejected pages do not contain "new" information because the first page contains "the sort of information [Commerce] routinely allows to be placed on the record" and the other two pages contain information already on this record "in a different format" or using "a different unit of measure." Id. at 10-11. By Sanhua's own admission, however, the information on the first rejected page came from the record of a prior administrative review, not this administrative review. See id. at 10. Furthermore, the other two pages do not contain information differing merely in format or unit of measure. Instead, as Defendant explains, the two other pages contain information

that differs <u>in substance</u> from what appears on this administrative record. Def.'s Resp. at 24-25 (citing and describing relevant record sources). Commerce reasonably concluded that the three pages contained "new" information that did not warrant consideration as part of Plaintiff's request for a ministerial error correction. <u>See</u> <u>Rejection Memorandum</u> at 1-2.

It seems that this issue is less about a genuine attempt to correct a ministerial error and more an effort to reargue the substantive merits of a surrogate value determination. Sanhua claimed in its submission that Commerce inadvertently valued brass scrap using dollars per kilogram (excluding freight and insurance) instead of dollars per net kilogram (including freight and insurance). Commerce, though, calculated a surrogate value for brass scrap using a methodology that Sanhua itself suggested during the proceeding. <u>See</u> <u>Error Memorandum</u> at 2-3; <u>Decision Memorandum</u> at 32-33. In persuading Commerce to utilize its preferred methodology, it appears Sanhua neglected to develop the record so that Commerce could value brass scrap in dollars per net kilogram. <u>See</u> <u>Error Memorandum</u> at 3 ("The Department did not choose a [surrogate value] measured in net kilograms, because no such value was timely filed on the record of this review."). It therefore appears to the court that this issue is not really about a ministerial error, but instead reflects Sanhua's untimely attempt to paper the record with missing information that would have enabled Commerce to calculate a more favorable surrogate value for brass scrap. In any event Commerce's denial of Sanhua's ministerial error request was reasonable on this administrative record.

### C. Commerce's 15-day policy

Lastly, Sanhua challenges Commerce's 15-day liquidation policy. Sanhua argues that SKF USA, Inc. v. United States, 33 CIT 1866, 1883-91, 675 F. Supp. 2d 1264, 1280-86 (2009), after remand, 34 CIT ___, Slip Op. 10-76 (2010) ("SKF II"), and Tianjin Mach. Imp. & Exp. Corp. v. United States, 28 CIT 1635, 1649-51, 353 F. Supp. 2d 1294, 1309-10 (2004) ("Tianjin") render Commerce's 15-day liquidation policy unlawful. Pl.'s Br. at 12-14. Defendant responds that the court lacks jurisdiction to review this issue because the court cannot review the liquidation policy under 28 U.S.C. § 1581(c) and because Sanhua does not have standing to challenge the policy. Alternatively, Defendant argues that Commerce's 15-day policy is a reasonable interpretation of the statute. Def.'s Resp. at 25-31.

Whether the court has subject matter jurisdiction to hear Plaintiff's challenge to Commerce's 15-day liquidation policy is an academic exercise. If Plaintiff's claim arises out of the final results of the subject administrative review, then jurisdiction exists under 28 U.S.C. § 1581(c). See Mittal Steel Galati S.A. v. United States, 31 CIT 730, 736, 491 F. Supp. 2d 1273, 1279-80 (2007) ("Mittal Steel I"). On the other hand, if Plaintiff's claim arises from agency action outside of the final results of the subject administrative review, then jurisdiction lies under 28 U.S.C. § 1581(i). See SKF USA Inc. v. United States, 31 CIT 405, 409-10 (2007) ("SKF I"). Regardless, the court has subject matter jurisdiction. See Mittal Steel I, 31 CIT at 736, 491 F. Supp. 2d at 1280. Here, the court exercises its jurisdiction to hear Plaintiff's challenge to Commerce's 15-day liquidation policy under § 1581(i). As to standing, the court sees no merit in the Government's argument. See

SKF II, 33 CIT at 1885-86, 675 F. Supp. 2d at 1281-82 (rejecting similar arguments). Even though it has jurisdiction over Plaintiff's claim, the court does not reach the merits on this issue because Sanhua's briefing on this issue is incomplete and inadequate.

Sanhua believes that naked citation to SKF II and Tianjin entitles it to declaratory relief as a matter of law. Sanhua, however, omits from its discussion several other decisions of the court that sustained Commerce's previous 15-day liquidation policy as a reasonable interpretation of the statute. See Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 1141, 502 F. Supp. 2d 1295, 1313, after remand 31 CIT 1776, 521 F. Supp. 2d 1409 (2007); Mittal Steel I, 31 CIT at 736, 491 F. Supp. 2d at 1279 (Gordon, J.); Mukand Int'l Ltd. v. United States, 30 CIT 1309, 1312, 452 F. Supp. 2d 1329, 1332 (2006) (Gordon, J.).

The premise of the adversarial system is that courts do not sit as self-directed boards of legal inquiry and research, but instead as arbiters of legal questions presented and argued by the parties. See Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983); MTZ Polyfilms, Ltd. v. United States, 33 CIT 1575, 1578-79, 659 F. Supp. 2d 1303, 1308-09 (2009) (explaining applicability of Carducci and waiver for inadequate briefing in actions at the Court of International Trade). This Court's Rules require that all motions "must . . . .state with particularity the grounds for seeking the order," USCIT R. 7(b)(1)(B), and that briefs in support of motions for judgment on the agency record "must include the authorities relied on and the conclusions of law deemed warranted by the authorities," USCIT R. 56.1(c)(2) (agency record actions other than a 1581(c) action); USCIT R. 56.2(c)(2) (1581(c) action); see also MTZ Polyfilms, 33 CIT at 1579, 659 F. Supp. 2d at

1309. Failing to enforce these requirements deprives the court "in substantial measure of that assistance of counsel which the system assumes." Carducci, 714 F.2d at 177.

There is no real argument in Sanhua's challenge to Commerce's 15-day liquidation policy. In fact, Sanhua's briefing is similar to argumentation the court deemed waived in JBF RAK LLC v. United States, 38 CIT ___, ___, 991 F. Supp. 2d 1343, 1356 (2014). Compare Pl.'s Br. at 12-14 with Pl. JBF RAK LLC's Mem. of Law in Supp. of its Mot. for J. on the Agency R. Pursuant to R. 56.2 at 21-23, JBF RAK, 38 CIT ___, 991 F. Supp. 2d 1343 (No. 13-cv-00211), ECF No. 32. There, the court faulted the plaintiff for failing to identify relevant authority and for failing to discuss and apply the appropriate analytical framework. JBF RAK, 38 CIT at ___, 991 F. Supp. 2d at 1356. "[T]o review the issue in this context," the court noted, "it would have to first assume the role of co-plaintiff, reframe [the plaintiff's] arguments under [Chevron], wrestle with the existing decisions on this issue, and analyze Commerce's 15–day policy under that framework. The court would effectively be litigating the issue for [plaintiff], which is something it cannot do." Id.

"It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived." United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013); see also Carducci, 714 F.2d at 177. Here, Sanhua fails to identify the relevant authority and apply the Chevron framework in analyzing the many competing policy issues implicated by this legal question. See Pl.'s Br. at 12-14. The court therefore deems this issue waived.[2]

---

[2] The court notes that Plaintiff's claim may also be subject to dismissal pursuant to Rule 41(b)(4) for failure to comply with the Court's Rules.

### III. Conclusion

For the foregoing reasons, Sanhua's motion for judgment on the agency record is denied. Judgment will be entered accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: April 24, 2015
      New York, New York